IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 23-cr-251-RM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.  XAVIER DREW,
    *a/k/a "Flock",*
    *a/k/a "Billy"*

    Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Bradley W. Giles,

Assistant United States Attorney for the District of Colorado, and the defendant, XAVIER

DREW, personally and by counsel, Mary Butterton, Assistant Federal Public Defender, submit

the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.  This agreement binds only the

Criminal Division of the United States Attorney's Office for the District of Colorado and the

defendant.

## I.    AGREEMENT

**A. Defendant's Plea of Guilty:**

The defendant agrees to:

    (1)     Plead guilty to **Counts 1 and 4** of the Superseding Indictment, which

allege: **<u>Count 1</u>**: Conspiracy to Distribute 400 grams and more of N-phenyl-N-[1-(2-

Court Exhibit

1

phenylethyl)-4-piperidinyl] propanamide (fentanyl), and 50 grams and more of

methamphetamine (actual), in violation of Title 21, United States Code, Sections

841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii) and 846; and **Count 4**: Trafficking in Firearms, in

violation of Title 18, United States Code, Sections 933(a)(1) and (a)(3);

(2)     The defendant will agree to be liable to the Small Business Association

("SBA") and to pay restitution in the amount of $14,582 related to a fraudulent Paycheck

Protection Program ("PPP") loan application which was subsequently granted and

forgiven (forgiveness application filed on or about October 4, 2021). In exchange for that

agreement, the government will not pursue criminal charges in relation to that matter.

(3)     waive certain appellate and collateral attack rights, as explained below,

and;

(4)     agrees not to contest forfeiture as more fully described below.

Mr. DREW reserves the right to request the Court suspend payment of PPP restitution

during any period of imprisonment. The government will not oppose that request.

**B.  Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). In exchange for

the defendant's guilty pleas, the government agrees not to file additional charges based on

conduct currently known to the U.S. Attorney's Office for the District of Colorado, and to

dismiss the remaining charges (Counts 2,3,5-18,20-22,24,25) against the defendant at the time of

sentencing. Moreover, the United States agrees to cap its sentencing recommendation at a Total

Adjusted Offense Level of 33, combined with the defendant's criminal history category as

determined by the Court. The parties understand that, should the plea of guilty be vacated on the

motion of the defendant, the government may, in its sole discretion, reinstate all charges in the

indictment and/or file a superseding indictment. The parties further understand that this agreement is not binding on the Court.

Provided the defendant does not engage in prohibited conduct or otherwise implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).

**C. Defendant's Waiver of Appeal:**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1) the sentence exceeds the maximum sentence provided in the statutes of conviction: Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii) and 846; and Title 18, United States Code, Sections 933(a)(1) and (a)(3);

(2) the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 33; or

(3) the government appeals the sentence imposed.

If the first criteria applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)     the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)     the defendant was deprived of the effective assistance of counsel; or

(3)     the defendant was prejudiced by prosecutorial misconduct.

The Defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The Defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**Restitution:**

The defendant agrees to pay restitution as ordered by the Court. As outlined herein, the defendant agrees to pay restitution in the amount of $14,582 related to a fraudulent PPP loan application which resulted in subsequent approval and forgiveness. In exchange for that agreement, the government will not pursue charges in relation to that matter.

**Forfeiture of assets:**

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited include any and all firearms and ammunition involved in the commission of the offense, as well as $19,881 in United States currency seized during the course of the investigation. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that the above-described property, which was seized from the

defendant and/or his co-defendants for evidentiary purposes, and which is currently in the

custody or control of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and/or the

United States Postal Inspection Service (USPIS), was lawfully seized and that it is evidence,

contraband, or fruits of the crimes to which the defendant is pleading guilty.  The defendant

relinquishes and abandons all claims, title, and interest the defendant has or may have had in

such property with the understanding and consent that the ATF and/or the USPIS may dispose of

the property without further obligations.

## II.    ELEMENTS OF THE OFFENSE

The parties agree that the elements of the charges to which the defendant is pleading

guilty are as follows:

**Count 1:  21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), (b)(1)(A)(viii) and 846 – Conspiracy to Distribute and to Possess with Intent to Distribute: 400 grams and more of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl); 50 grams and more of methamphetamine (actual) and 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine**

*First*:   Two or more persons agreed to violate the federal drug laws;

*Second*: The defendant knew the essential objective of the conspiracy;

*Third*:  The defendant knowingly and voluntarily involved himself in the conspiracy;

*Fourth*: There was interdependence among the members of the conspiracy; and

*Fifth*: the overall scope of the conspiracy involved: (1) 400 grams and more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl); and 50 grams and more of methamphetamine (actual) and 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine. Methamphetamine and Fentanyl are Schedule II Controlled substances under federal law.

-10th Cir. Pattern Jury Instruction 2.87 (2021 modified)

**Count 4**:  **Trafficking in Firearms, in violation of 18 U.S.C. § 933(a)(1)**

*First:*  The defendant knowingly [transferred] and [disposed of] a firearm to another
person;

*Second:* That the shipping, transporting, transferring, causing to be transported or
disposition of the firearm was in or otherwise affecting interstate commerce; and

*Third:* That the defendant knew or had reasonable cause to believe that the use, carrying
or possession of the firearm by the other person/recipient would constitute a
felony.

*See* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/933mod.docx

## III.   STATUTORY MAXIMUM SENTENCE

The maximum penalties for a violation of **Count 1** of the Superseding Indictment are: not

less than 10 years and not more than life imprisonment; not less than 5 years and up to a lifetime

of supervised release; maximum fine $10,000,000; a $100 mandatory victim's fund assessment

fee; and restitution.

The maximum penalties for a violation of **Count 4** of the Superseding Indictment are: not

more than 15 years imprisonment; not more than 3 years of supervised release; maximum fine

$250,000; a $100 mandatory victim's fund assessment fee; and restitution.

## IV.   COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights

to possess firearms, vote, hold elected office, and sit on a jury.

## V.   STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will

tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as

part of its sentencing methodology, compute the advisory guideline range for the offense of

conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.  The parties agree as follows:

In October of 2022, federal law enforcement agencies began investigating narcotics trafficking in Denver, Colorado, stemming from information obtained from a Source of Information (SOI).  The investigation revealed that Xavier DREW and others were engaged in the purchase and distribution of methamphetamine, fentanyl and firearms within the District of Colorado and elsewhere.

November 30, 3033 Transaction:

On November 30, 2022, at the direction of ATF SAs, the SOI engaged in conversation with DREW using the DREW's phone number (hereinafter referred to as Target Telephone 1 or "TT-1").  Pursuant to that conversation, a meeting was arranged. At the meeting on that date, an ATF special agent, working in an undercover capacity [hereinafter "UC1"], and the SOI, conducted an undercover controlled purchase from DREW at a Waffle House in Aurora, Colorado.  UC1 paid DREW $600.00 for a **TAURUS G2S 9mm pistol**, $300.00 for approximately **100 fentanyl pills weighing 11.15 grams**, and $1,300.00 for a **Glock 17 Gen4 9mm pistol**.  During the meeting, DREW was armed with the Glock pistol while he sold UC1

the TAURUS pistol and suspected fentanyl pills. DREW told UC1 the Glock was for his (DREW's) protection. Later during the meeting, DREW sold UC1 that Glock pistol. During the transaction, DREW told UC1 he was expecting two more Glock pistols and, if he received them, he would sell them to UC1. DREW told UC1 that fentanyl pills were $3.00 a pill, but he would lower the price if UC1 purchased higher quantities. DREW also stated he could provide UC1 with Glock "switches" (devices added to a firearm which allow it to fire in a fully-automatic manner). Finally, during this meeting the UC informed DREW that the firearms were headed to Mexico. Thus, the parties stipulate that DREW knew and had reasonable cause to believe that the firearms which he sold during this investigation would travel in and affect interstate and foreign commerce, and that their possession and subsequent transportation to Mexico would constitute a felony offense by those who were taking possession of the firearms.

December 1, 2022:

On December 1, 2022, U.S. Postal Inspection Service (USPIS) became aware of United States Postal Service (USPS) Priority Mail Parcel 9505 5118 0548 2335 4709 86 (the Subject Parcel.) The Subject Parcel was addressed to "Xavier Drew, 2367 S Blackhawk, St apt 140, Aurora, Co 80014" and had the return address of "Rogur Gonzalez 1110 n Dycen Pd, Avanbuh 85232" (the Avanbuh address).

After obtaining a search warrant for the parcel, inspectors found the package to contain a children's Mickey-Mouse Interactive Music Mat box. Within the mat, agents recovered a transparent vacuum-sealed bag containing a crystalline substance of **444.55 grams of 76% pure methamphetamine (337 grams of methamphetamine - actual)** and transparent latex glove

containing numerous **fentanyl pills weighing 109.87 grams** in a variety of colors with an imprint of an "M" and "30" on their respective sides.

Subsequent investigation revealed that these pills were mailed to Xavier Drew by Esvin Calles-Corrales, a narcotics source of supply in Arizona. Calles-Corrales' fingerprints were recovered from the packaging, and telephonic and/or electronic communications confirmed the link. Additionally, a review of Esvin Calles-Corrales' Block Inc. (Cash App) business records reveals that from November 28, 2022, to November 29, 2022, DREW paid Calles-Corrales $1,500 in United States Currency.

December 13, 2023:

Between December 12, 2022, and December 13, 2022, UC1 and DREW (TT-1) engaged in conversation discussing the purchase of firearms and fentanyl. On December 13, 2022, UC1 conducted an undercover controlled purchase from DREW at a location in Denver, Colorado. DREW arrived at the location accompanied by co-conspirators Daiquan MARSHALL and "R.M.". During that transaction, UC1 purchased: one **Anderson Manufacturing, model AM-15, .556 caliber, semi-automatic pistol**; one **privately made firearm (PMF) - a semi-automatic pistol**, bearing no identifiable markings or S/N; one **SCCY Industries, model CPX-2, .9mm semi-automatic pistol**; and **101 suspected fentanyl pills weighing 11.21 grams** from DREW for a total of $2,900. PMFs with no serial numbers are also commonly referred to as "ghost guns". During this meeting, DREW stated that the firearms had come from an individual herein identified by the initials R.M., and when asked about Glock switches, he referred the UC to R.M., who remained in the vehicle.

January 4, 2023:

On January 4, 2023, UC1 conducted an undercover controlled purchase of a .38 special handgun from DREW at a location in Denver, Colorado. DREW arrived at the location accompanied by another male. DREW followed UC1 inside the location while the other male remained outside. After discussions regarding various narcotics trafficking arrangements, DREW retrieved a **revolver** from his jacket pocket and placed it on the desk, agreeing to sell it for $350.00. UC1 purchased the revolver from Drew.

February 1, 2023:

On February 1, 2023, DREW met with Undercover Agents at a location in Denver, CO. The UCs conducted an undercover controlled purchase from DREW, paying him $2,200 for the purchase of approximately **1000 fentanyl pills weighing 109.7 grams**. During the meeting, DREW stated he sends, and causes to be sent, fentanyl to Wyoming through the mail. DREW offered to mail the UC narcotics in Wyoming. DREW said he has five other people helping him send parcels. DREW said he accepts payments for narcotics using CashApp, Walmart to Walmart, or directs others to pick up physical U.S. currency.

February 3, 2023:

On February 3, 2023, DREW arrived at a location in Denver and provided UC2 with **five machine-gun conversion kits**, also known as "Glock switches", **a Privately Made Firearm (PMF) "ghost gun"**, and **a firearms silencer**. DREW explained that the Glock switches were from his associate, and he was not sure how to attach them to the PMF. DREW requested payment for brokering the transaction and a separate payment to his associate for $2,500 for the cost of the Glock switches, ghost gun, and suspected silencer.

UC2 paid DREW $500 dollars for brokering the transaction. DREW then placed a phone call and instructed the party on the other end of the call to come inside. A male associate, D.M., then entered the UC location. D.M. was wearing a full-face mask in an attempt to conceal his identity. D.M. proceeded to install a Glock switch on the PMF, converting the weapon to a suspected machine gun. D.M. then left the UC location leaving DREW with UC2. DREW then collected $2,500 from UC2. Thus, DREW sold to the UC a Glock handgun, with a full-auto conversion kit attached. As he well knew, absent adherence to ownership and transfer requirements these types of firearms, it was illegal for DREW to possess or transfer this type of weapon, and DREW had reasonable cause to believe that its possession by the UC was also illegal and would constitute a felony offense.

February 21-25, 2023:

Starting on February 21, 2023, DREW (using TT-1) engaged in conversation with UC2 discussing the purchase of fentanyl. For a total of $4,400, DREW agreed to sell UC2 2,000 fentanyl pills, which DREW agreed to mail to a P.O. Box in Wyoming.

Subsequently, after confirming that he had mailed the fentanyl, DREW agreed to meet UC2 on March 1, 2023 to secure payment. DREW's parcel was seized by investigators on February 25, 2023. It contained **over 2,000 fentanyl tablets, with a weight of 222 grams**.

March 1, 2023:

On March 1, 2023, DREW traveled to the U/C location in Denver to secure the previously-negotiated payment for the fentanyl pills. There, he received $4,400. DREW then provided UC2 with **two machine gun conversion kits**; **one Privately Made Firearm (PMF), a .40 caliber pistol bearing no serial number** and a **Para-Ordnance MFG., model P10, .45**

caliber pistol, **with an obliterated serial number**. For the firearms, UC2 paid DREW $2,500 dollars. When asked if he had fentanyl, DREW went to his vehicle and retrieved **100 fentanyl pills, weighing a total of 11.08 grams**. DREW sold the pills to the UCs for $300 dollars.

March 23, 2023:

On March 23, 2023, Postal Inspectors intercepted a parcel mailed by DREW to a male herein identified as "M.V." in Michigan. DREW was photographed mailing the parcel. A search warrant was obtained, and the parcel was found to contain: 19.08 grams of a mixture and substance which was confirmed to contain 98% pure methamphetamine (**18.69 grams of methamphetamine – actual**). It further contained **79 fentanyl tablets, with a total weight of 8.60 grams**. It was later confirmed that M.V. had ordered drugs from DREW.

March 30, 2023:

On March 30, 2023, DREW arrived at an undercover location and sold agents **225.94 grams of methamphetamine (actual)** for $1,400. In exchange for an additional $4,400, DREW also sold the agents approximately **1,970 fentanyl pills with a total weight of 214 grams**.

April 17, 2023:

On April 17, 2023, DREW reached out to firearms source of supply Jackson Presser requesting firearms for subsequent sale to the UCAs. Intercepted communications confirmed that Presser was able to purchase and assemble firearms, one of which was then provided to DREW for sale to the undercover agents on that same date. That firearm was an **Anderson Manufacturing, Model AM-15, Multi Caliber AR style pistol, with an obliterated serial**

**number**. Additionally, DREW sold the agents: approximately **122 grams of methamphetamine** (mixture and substance) and **1,000 fentanyl pills, with a total weight of 108 grams**.

April 24, 2023:

On April 23, 2023, agents intercepted conversations occurring over TT-1 indicating that DREW was attempting to pick up 4,000 fentanyl pills from an individual identified as Darryl Goodman. As a result, on April 24th at approximately 8:15 a.m., agents began surveillance in the vicinity of DREW's vehicle.

At approximately 10:42 a.m., DREW arrived at the Cedar Run apartment complex and he called GOODMAN to let him know that he had arrived. GOODMAN then exited unit 107G and completed the transaction.

At approximately 10:50 a.m., a traffic stop was conducted on DREW's vehicle as it departed the area. DREW was asked to roll down the windows and he stated that there was a bb gun in the back seat. Upon rolling down the windows, officers noted the presence of an AR-15 style rifle in the back seat (later confirmed to be a bb-gun.) The front passenger seat was occupied by Daiquan Marshall, who had warrants for his arrest. Upon seeing the rifle, both DREW and Marshall were ordered out of the vehicle and a search was conducted.

Items recovered from DREW's vehicle included a scale in the center console, suspected counterfeit Xanax pills in the driver's side door and a small amount of methamphetamine and crack in the center console. DREW spontaneously uttered that there were drugs inside the center console, but not much. DREW asserted that he was not aware of any guns in the vehicle, other than the bb gun.

Behind the passenger side seat, where Marshall was seated, there was a camouflage backpack. That backpack contained approximately: 6 grams of mushrooms, 6 grams of methamphetamine (1 baggie), 113 grams of marijuana in 2 white envelopes, a black lockbox containing U.S. currency, a green pill bottle containing suspected fentanyl pills, a prescription pill bottle with the name "Daiquan Marshall" on it which contained a small number of suspected fentanyl pills. The backpack also contained a handgun.

Also in the back seat of the vehicle was a loaf of bread. It was not searched.

Following the conclusion of the traffic stop, agents intercepted a telephone call confirming that the fentanyl which Goodman sold to DREW and Marshall was missed during the search; it had been concealed within the loaf of bread. Based on this information, an undercover agent reached out to DREW requesting that he mail 3,000 fentanyl pills to Wyoming.

DREW's girlfriend, Leahna Morris, was subsequently observed conducting narcotics transactions for DREW. At DREW's direction, and aware of the contents, Morris then mailed a parcel containing the fentanyl pills to an undercover post office box in Wyoming. The parcel was confirmed to contain approximately **3,000 fentanyl pills, which weighed 322.3 grams**.

The next day, April 23, 2023, DREW met UC3 at an undercover location. He received a $3,300 partial payment for the pills.

April 27, 2023:

On April 27, 2023, DREW called UC3 and informed him that he (DREW) was out of town and he was sending his girlfriend to meet UC3. DREW told UC3 that his girlfriend had the ½ pound of methamphetamine that he (DREW) had previously agreed to sell to UC3. DREW

told UC3 that the methamphetamine was $1,400 dollars and that they still owed $3,300 for the fentanyl that had been mailed to the P.O. Box in Wyoming on April 24, 2023.

At approximately 4:42 p.m., DREW contacted UC3, stating that his girlfriend (Leahna Morris) had arrived at the U/C location. Morris then sold UC3 approximately **283 grams of a mixture and substance containing methamphetamine.** UC3 paid MORRIS $3,300 dollars in pre-recorded USPIS buy money for the previously-mailed fentanyl and $1,400 dollars in pre-recorded USPIS buy money for the methamphetamine.

All of the firearms reference herein meet the definition of a "firearm" under federal law and functioned as designed. All have traveled in or affected interstate or foreign commerce. References to fentanyl pills are pills composed of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), a Schedule II Controlled Substance.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the guideline range. The parties may argue that

facts identified in the presentence report, or otherwise identified during the sentencing process,

affect the estimate below.

a) Pursuant to U.S.S.G. § 2D1.1(c)(3), the parties agree that the base offense level is **34**.

b) Pursuant to U.S.S.G. § 2D1.1(b)(1), a **two-level enhancement** applies because a dangerous weapon was possessed.

c) Pursuant to U.S.S.G. § 2D1.1, the parties agree that there are no other applicable adjustments to the Base Offense Level. The parties have not identified any Specific Offense Characteristics.

d) The parties agree that the defendant is not eligible for "Safety Valve" relief, pursuant to U.S.S.G. § 5C1.2.

e) Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a **two-level** reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a **one level** reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

f) The Total Adjusted Offense Level is **33**.

g) The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions. The parties estimate that the defendant is in criminal history category I.

h) The parties do not anticipate that the career offender/criminal livelihood/armed career criminal adjustments will apply.

i) With an estimated criminal history category of I, the advisory guideline range resulting from these calculations is 135-168 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 135 months (bottom of Category I) to 293 months (top of Category VI).

There is a 10-year mandatory minimum term of imprisonment. The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

j) Pursuant to guideline § 5E1.2, assuming the estimated offense level is 33,

the fine range for this offense would be $35,000 to $10,000,000, plus applicable interest and penalties.

k)      Pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(B), there is a 5-year mandatory minimum term of supervised release, and up to a lifetime of supervision. Pursuant to U.S.S.G. §5D1.2, the advisory guideline range for a term of supervised release is 5 years.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.    ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

. . .

. . .

. . .

. . .

. . .

Date:   11-14

XAVIER DREW
Defendant

Date:   11/14/23

Mary Butterton
Attorney for Defendant

Date:   11/14/23

Bradley W. Giles
Assistant U.S. Attorney